## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE STRICKER, Derivatively on Behalf of Nominal Defendant PJT PARTNERS INC., | |
| Plaintiff, | Civil Action No.: 16-3521 |
| v. | |
| PAUL J. TAUBMAN, ANDREW W. W. CASPERSEN, HELEN T. MEATES, KENNETH C. WHITNEY, DENNIS S. HERSCH, THOMAS M. RYAN, and EMILY K. RAFFERTY, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| PJT PARTNERS INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Eugene Stricker ("Plaintiff"), by and through his undersigned counsel, alleges as follows upon personal knowledge as to himself and his own acts, and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by PJT Partners Inc. ("PJT" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.

## INTRODUCTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty brought on behalf of nominal defendant PJT against certain officers and members of the Company's Board of Directors (the "Board").

2.      PJT provides various strategic advisory, restructuring and special situations, and fund placement and secondary advisory services to corporations, financial sponsors, institutional investors, and governments worldwide.  PJT was formerly the financial and strategic advisory services, restructuring and reorganization advisory services, and Park Hill Group businesses of The Blackstone Group L.P. ("Blackstone"), until a spin-off completed on or around October 1, 2015 established PJT as an independent entity.  The Company operates Park Hill Group as its global advisory and placement arm.  Through Park Hill Group, PJT provides fund placement and secondary advisory services for alternative investment managers, including private equity funds, real estate funds and hedge funds.

3.      From its initial public offering on October 1, 2015 to the present (the "Relevant Period"), the Individual Defendants (defined below) caused the Company to maintain inadequate compliance and fraud-prevention controls.  As a consequence of the inadequate controls, defendant Andrew W. W. Caspersen ("Caspersen"), a managing partner at Park Hill Group, was able to perpetrate a criminal scheme to defraud investors of more than $95 million.  As a result of Caspersen's fraud, which was only possible because of the Individual Defendants' breaches of fiduciary duty, as described herein, the Individual Defendants caused the Company to make false or misleading public statements regarding the Company's business, operational, and compliance policies.

4.      On March 28, 2016, the United States Attorney for the Southern District of New York ("SDNY") announced the arrest of Caspersen on charges of securities fraud and wire fraud.

2

In a parallel action, the SEC also charged Caspersen with defrauding two institutions to invest in a shell company that he controlled.  Caspersen was terminated for cause from his position at Park Hill Group on the same day.

5.     On this news, PJT's stock price dropped $2.81 per share, or over 10%, to close at $23.66 per share on March 28, 2016.

6.     On April 6, 2016, in an article entitled "A Wall Street Family's Charmed Life Is Thrown Into Turmoil," the *New York Times*, citing a "person with direct knowledge of the situation," reported that Caspersen "had taken advantage of [Park Hill Group's] payment process that allowed him to personally send out invoices to clients" to perpetrate his fraudulent scheme.

7.     On April 8, 2016, the Company filed a Form 8-K with the SEC which included a statement on Caspersen's fraud.  In the statement, PJT alleged that Caspersen's unlawful transactions began in late 2014, significantly earlier than the July 2015 timeline identified by the U.S. Attorney's Office for the SDNY and SEC.

8.     As a result of the Individual Defendants' breaches of fiduciary duty, as described herein, they caused or allowed the Company to:

     (a)     maintain inadequate compliance and fraud-prevention controls; and

     (b)     release statements about the Company's business, operations, and future business prospects that were materially false and misleading, and/or lacked a reasonable basis.

9.     As the truth about Caspersen's fraud and the Individual Defendants' lack of internal controls was revealed to investors, the Company's share price, and investor confidence in the Company declined.  The Company and Caspersen are now defendants in a federal securities class action, *Barrett v. PJT Partners Inc., et al.*, 16 Civ. 2841 (S.D.N.Y.), brought on behalf of all persons or entities who purchased or otherwise acquired the publicly-traded

securities of PJT between November 12, 2015 and March 28, 2016, inclusive, seeking remedies under the Securities Exchange Act of 1934 (the "Securities Class Action").

10.     The Individual Defendants' malfeasance has caused, and will continue to cause, PJT and its stockholders great harm by: (i) indelibly damaging the reputation and goodwill in general; and (ii) exposing the Company to potential criminal and civil liability.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 on two grounds.  First, such jurisdiction exists because Plaintiff's state law claims are dependent on the resolution of substantial questions of federal law.  Specifically, Plaintiff alleges that the Individual Defendants breached their fiduciary duties to PJT and its stockholders by allowing PJT to violate the federal securities laws.  Second, the federal contribution claims asserted herein arise under and pursuant to the provisions of the Sections 10(b) and 21(D) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78u-4(g).  Plaintiff also asserts pendant common law claims under 28 U.S.C. 1367.  This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to

PJT occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14.     Plaintiff is a stockholder of PJT, was a stockholder of PJT at the time of the wrongdoing alleged herein, and has been a stockholder of PJT continuously since that time. Plaintiff resides in New York.

15.     Nominal Defendant PJT is a Delaware corporation with its principal executive offices located at 280 Park Avenue, New York, New York 10017.  The Company's stock is listed on the New York Stock Exchange ("NYSE") under the symbol "PJT."

16.     Defendant Paul J. Taubman ("Taubman") founded PJT in early 2013 and has served as Chairman of the Board and Chief Executive Officer ("CEO") since the Company went public on October 1, 2015.  He also serves as the Chair of the Nominating and Governance Committee.  Prior to founding PJT, defendant Taubman was Co-President of Morgan Stanley's Institutional Securities Division.

17.     Defendant Caspersen was a managing partner at PJT's Park Hill Group at all relevant times until his termination on March 28, 2016.  Caspersen is a defendant in the Securities Class Action.

18.     Defendant Helen T. Meates ("Meates") has been a partner and served as Chief Financial Officer ("CFO") of PJT since the Initial Public Offering ("IPO").  Prior to that, she worked at Morgan Stanley for twenty-two years, most recently serving as a managing director. As CFO, she either knew or should have known about Caspersen's fraudulent activities.

19.     Defendant Kenneth C. Whitney ("Whitney") has served on the Board since the IPO.  He also serves as the Chair of the Audit Committee.  Whitney was previously a Senior

Managing Director and Head of Blackstone's Investor Relations & Business Development Group from 1998 to April 2013 and served as a Senior Advisor to Blackstone from April 2013 until September 2015.

20.  Defendant Dennis S. Hersch ("Hersch") has served on the Board since the IPO. He is a member of the Audit Committee and the Compensation Committee.  Defendant Hersch is President of N. A. Property, Inc.  He was a Managing Director of J.P. Morgan Securities Inc. from December 2005 through January 2008, where he served as the Global Chairman of its Mergers & Acquisitions Department.

21.   Defendant Thomas M. Ryan ("Ryan") has served on the Board since the IPO.  He is the Chair of the Compensation Committee and a member of the Nominating and Governance Committee.  Defendant Ryan is the former Chairman and Chief Executive Officer of CVS Health Corporation, formerly known as CVS Caremark Corporation.  He has served as an operating Partner at the private equity firm Advent International Corporation since 2011.

22.  Defendant Emily K. Rafferty ("Rafferty") has served on the Board since the IPO. She is a member of the Audit Committee and the Nominating and Governance Committee. Rafferty is President Emerita of The Metropolitan Museum of Art.  She was elected President of the museum in 2005 and served in that role until her retirement in March 2015.

23.  The individuals listed in ¶¶ 16 and 19-22 are collectively referred to herein as the "Director Defendants" and, together with Caspersen and Meates, the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.  By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and

6

manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.  The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

25.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the officers and directors of PJT were required to, among other things:

a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b)      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained

an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

        d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

        e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

26.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

27.     PJT's Code of Business Conduct and Ethics further articulates the directors', officers', and employees' responsibilities and states, in part, as follows:

**FAIR DEALING**

Each director, officer and employee shall endeavor to deal fairly with the Company's clients, competitors, suppliers and employees. No director, officer or employee shall take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair practice.

No bribes, kickbacks or other similar payments in any form shall be made directly or indirectly to or for anyone for the purpose of obtaining or retaining business or obtaining any other favorable action. Such payments, even if made indirectly through a consultant, contractor or other intermediary are prohibited. In addition to payments and gifts, offering employment opportunities may also violate anti-bribery laws. The Company and the director, officer or employee involved may be subject to disciplinary action as well as potential civil or criminal liability for violation of this Code.

**COMPLIANCE WITH LAWS, INSIDER TRADING AND OTHER MATTERS**

The Company operates strictly within the bounds of the laws, rules and regulations that affect the conduct of our business. You are expected to know and to follow the law. Supervisors, managers or other appropriate personnel must ensure that employees understand and are informed of the requirements relating to their jobs. They must also be available to answer employee questions or concerns and, when necessary, to guide them to other subject matter experts, including the Company's outside counsel. There are serious consequences for failing to follow any applicable laws, rules and regulations, up to and including termination of employment and potential criminal and civil penalties.

\*       \*       \*

**ACCURACY OF COMPANY RECORDS AND REPORTING**

The Company's financial information and statements are prepared in compliance with generally accepted accounting principles and statutory accounting practices and procedures for regulatory purposes. Our records must accurately and fairly reflect, in reasonable detail, the Company's assets, liabilities, revenues and expenses.

The records, data and information owned, used and managed by the Company must be accurate and complete. You are personally responsible for the integrity of the information, reports and records under your control. Making false or misleading statements to anyone, including internal or external auditors, counsel, other Company employees or regulators can be a criminal act that can result in severe penalties. You must never withhold or fail to communicate information that should be brought to the attention of higher level management.

To be sure that work-related communications comply with all our policies and applicable laws, we require review of certain communications. If you are approached by the media, an investor or an analyst or wish to publish information or make an external presentation, you should contact the General Counsel for advice and review. You must also review the "Policy and Procedures for Compliance with Regulation FD" for further information related to outside communications about the Company.

28. Defendants Whitney (chair), Hersch, and Rafferty also served as members of the Audit Committee and therefore have further responsibilities and duties as set forth in the Audit Committee Charter. In particular, the Audit Committee Charter describes those duties and responsibilities, as follows:

9

## I.      PURPOSE

The Audit Committee (the "Committee") of the Board of Directors (the "Board of Directors") of PJT Partners Inc. (the "Company") shall:

> A.      Provide assistance to the Company's Board of Directors with respect to its oversight of:
>
> > (i)      The quality and integrity of the Company's financial statements and accounting and financial reporting processes;
> >
> > (ii)     The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;
> >
> > (iii)    The independent registered public accounting firm's qualifications, performance and independence; and
> >
> > (iv)    The performance of the Company's internal audit function or, if the Company does not yet have an internal audit function because it is relying on applicable transition periods under the rules of the New York Stock Exchange (the "NYSE"), the design and implementation of the internal audit function.
>
> B.      Prepare the audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

*      *      *

## IV.     RESPONSIBILITIES AND DUTIES

The following functions are expected to be the common recurring activities of the Committee in carrying out its responsibilities.  These functions should serve as a guide with the understanding that the Committee may carry out additional functions and adopt additional policies and procedures as may be required or appropriate in light of changing business, legislative, regulatory, legal or other conditions.  The Committee may also carry out any other responsibilities and duties delegated to it by the Board of Directors from time to time.

The Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate and may, in its sole discretion, retain, obtain the advice of and terminate any consultant, legal counsel or other adviser to the Committee as it determines necessary or appropriate to carry out its duties.  The Committee shall be directly responsible for the appointment, compensation and oversight of any

consultant, legal counsel or other adviser retained by the Committee.  The Company shall provide appropriate funding, as determined by the Committee, for payment of compensation to the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company and any advisers that the Committee chooses to engage, as well as funding for the payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

The Committee shall be given full access to the Company's internal auditors (or other personnel or service providers responsible for the internal audit function), Board of Directors, corporate executives, employees and independent registered public accountants as necessary to carry out these responsibilities.

*  *  *

[Documents/Reports Review]

5. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

*  *  *

[Accounting and Financial Reporting Process]

13. Obtain from the independent registered public accounting firm assurance that it has not detected or otherwise become aware of information indicating that an illegal act (whether or not perceived to have a material effect on the financial statements of the Company) has or may have occurred.

29. Defendants Whitney, Hersch, and Rafferty failed to carry out their duties as set forth above resulting in the breaches of fiduciary duty described herein and face a substantial likelihood of liability.

## BACKGROUND

30. PJT provides various strategic advisory services in restructuring and other special situations, and fund placement and secondary advisory services to corporations, financial sponsors, institutional investors, and governments worldwide.  PJT was formerly the financial

and strategic advisory services, restructuring and reorganization advisory services, and Park Hill Group businesses of Blackstone, until a spin-off and IPO completed on or around October 1, 2015 established PJT as an independent entity.  Through Park Hill Group,[1] PJT provides fund placement and secondary advisory services for alternative investment managers, including private equity funds, real estate funds, and hedge funds.

31.     At all relevant times until his termination on March 28, 2016, Caspersen was a managing partner at Park Hill Group.

**The Materially False and Misleading Statements**

32.     PJT went public on October 1, 2015.  Caspersen's widespread securities fraud scheme was ongoing at that time and continued until his arrest on March 28, 2016.  In addition to allowing Caspersen to carry-out his scheme at the Company during the Relevant Period, the Individual Defendants caused or allowed the Company to make a series of false and/or misleading statements concealing it from stockholders and the investing public.

33.     On November 12, 2015, PJT filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, PJT reported net income of $41.89 million, or $2.22 per diluted share, on net revenue of $147.32.

34.     In the Q3 2015 10-Q, the Individual Defendants caused or allowed the Company to describe Park Hill Group as "a world leading fund placement agent" and "the only group among its peers with top-tier dedicated private equity, hedge fund, real estate and secondary advisory groups."

---

[1] Since its inception, prior to the formation of PJT, Park Hill has served as a global advisory and placement agent to private equity, real estate, and hedge funds.

35.     The Q3 2015 10-Q contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by defendants Taubman and Meates, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

36.     On February 29, 2016, PJT filed its annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, PJT reported a net loss of $13.19 million, or $0.72 per diluted share, on net revenue of $103.82 million.  For 2015, PJT reported net income of $7.58 million, or $0.42 per diluted share, on net revenue of $405.94 million, compared to net income of $4.49 million on net revenue of $401.07 million for 2014.

37.     In the 2015 10-K, the Individual Defendants again caused or allowed the Company to describe Park Hill Group as "a world-leading fund placement agent" and "the only group among its peers with top-tier dedicated equity, hedge fund, real estate and secondary advisory groups."  The 2015 10-K further stated:

> ***Regulation***
>
> Our business, as well as the financial services industry generally, is subject to extensive regulation in the U.S. and across the globe.  As a matter of public policy, regulatory bodies in the U.S. and the rest of the world are charged with safeguarding the integrity of the securities and other financial markets and with protecting the interests of customers participating in those markets.  In the U.S., the SEC is the federal agency responsible for the administration of the federal securities laws.    PJT Partners LP, through which strategic advisory and restructuring and special situations services are conducted in the United States, and Park Hill Group LLC, which is an entity within the Park Hill Group fund placement and secondary advisory business, are registered broker-dealers.  These registered broker-dealers are subject to regulation and oversight by the SEC. In addition, the Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization that is subject to oversight by the SEC, adopts and enforces rules governing the conduct, and examines the activities of its member firms, which would include any such registered broker-dealer.  State securities regulators also have regulatory or oversight authority over any such registered broker-dealer.

\*      \*      \*

Certain parts of our business are subject to compliance with laws and regulations of U.S. Federal and state governments, non-U.S. governments, their respective agencies and/or various self-regulatory organizations or exchanges relating to, among other things, the privacy of client information, and any failure to comply with these regulations could expose us to liability and/or reputational damage.

38.    The 2015 10-K contained signed certifications pursuant to SOX by defendants Taubman and Meates, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

39.    Throughout the Relevant Period, the Individual Defendants caused or allowed the following statements to appear on Park Hill Group's website (www.parkhillgroup.com):

- Park Hill provides global alternative asset advisory and fundraising services across four specialized verticals.  Our platform includes deep expertise in private equity, real estate and hedge funds, as well as secondary advisory services.

- Leveraging a senior team with an average of over 15 years of global alternative asset and distribution experience, Park Hill knows the investment preferences of the world's biggest institutional investors.

- Along with our rigorous engagement model and global relationships, our breadth enables us to customize high-quality solutions for the needs of our clients.

- Park Hill, since its inception, has served as a global advisory and placement agent to funds that raised in excess of $260 billion for 194 private equity, real estate funds, and hedge funds.  Additionally, we provide top-tier global distribution capabilities through our senior relationships across the limited partner arena.

- Our senior practitioners are actively involved in every stage of the fundraising process and lead our uncompromising dedication to achieving superior client outcomes.

40.    The Individual Defendants caused the Company to make false and/or misleading statements, as well as fail to disclose material adverse facts about the Company's business,

operations, and compliance policies.   Specifically, the Individual Defendants caused the Company to make false and/or misleading statements and/or fail to disclose that:  (i) PJT's compliance and fraud-prevention controls were inadequate; (ii) as a consequence of the Company's inadequate controls, Caspersen, a managing partner at Park Hill Group, perpetrated a criminal scheme to defraud investors of more than $95 million; and (iii) as a result of the foregoing, PJT's public statements were materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

41.     On March 28, 2016, the U.S. Attorney for the SDNY announced Caspersen's arrest on charges of securities and wire fraud for scheming to defraud investors of more than $95 million since at least July 2015.  In a parallel action, the SEC charged Caspersen with defrauding two institutions to invest in a shell company that he controlled.

42.     On the same day, the Company terminated Caspersen for cause.  The press release PJT issued on the matter stated in relevant part:

> Since the inception of our Firm, an unconditional principle of integrity has been a core value as we build a lasting franchise.  Our commitment to clients begins and ends with honesty and transparency, and strict adherence to these values is the absolute cornerstone of our Firm.

> We were therefore stunned and outraged to learn of the fraudulent circumvention and violation of the Firm's compliance policies and ethical standards by Andrew Caspersen, who was a member of the Secondaries Group at Park Hill since January 2013.  Immediately upon learning of facts that suggested improper behavior, we commenced an internal investigation led by outside counsel, Paul, Weiss, Rifkind, Wharton & Garrison, and very quickly thereafter, brought the matter to the attention of the U.S. Attorney's Office in Manhattan.  Since that time we have cooperated fully with law enforcement, and we will continue to do so.  We have terminated Mr. Caspersen for cause.

> Because this matter is the subject of a continuing investigation by the authorities, and our review is ongoing, we are not in a position to provide any additional information at this time.  Our Firm's reputation for ethical behavior is fundamental to our business and our highest priority is maintaining the trust of our clients.

43.     On this news, PJT's stock price dropped $2.81 per share, or over 10%, to close at $23.66 per share on March 28, 2016.

44.     On April 6, 2016, in an article entitled "A Wall Street Family's Charmed Life Is Thrown Into Turmoil," the *New York Times* cited a "person with direct knowledge of the situation" and reported that Caspersen "had taken advantage of [Park Hill Group's] payment process that allowed him to personally send out invoices to clients" to perpetrate his fraudulent scheme.

45.     On April 8, 2016, the Company filed a Form 8-K with the SEC with a statement on Caspersen's fraud.  In the statement, PJT alleged that Caspersen's unlawful transactions began in late 2014, significantly earlier than the July 2015 timeline identified by the Manhattan U.S. Attorney's office and SEC in their March 28, 2015 complaints accompanying his arrest, and signifying that the scheme was ongoing at the time the Company went public.  The Company stated in relevant part:

> PJT Partners Inc. (the "Company") has substantially completed its review of information available to it for the period of Andrew W. W. Caspersen's employment with Park Hill from early 2013 through the date of his arrest, and has determined the following:
>
> Commencing in late 2014 through March of 2016, Mr. Caspersen conducted a number of unauthorized and unlawful transactions outside the scope of his employment with Park Hill.  They consisted of schemes Caspersen presented to his family and personal network to make investments in entities formed by him with names resembling parties in legitimate Park Hill transactions.  No clients of Park Hill were actual parties in Caspersen's transactions, which were conducted by Caspersen acting alone.  Other than the $25 million payment by the party affiliated with Moore Capital Management referred to in the complaint filed by the office of the United States Attorney of the Southern District of New York, the Company has found a small number of apparent victims, consisting of Caspersen relatives and friends, who made payments totaling approximately $14 million in Caspersen's schemes.
>
> During the course of the Company's review of the legitimate transactions of Park Hill in which Mr. Caspersen was involved, it has found no evidence of irregularities.

Separately, in two instances instead of submitting legitimate client invoices prepared by Park Hill in the amount of $8.9 million, Caspersen replaced them with false invoices containing modified payment instructions.  He was able to misdirect the client payments to an account controlled by him using an elaborate structure of entities, domain names and bank accounts that he created.  He subsequently wired the exact amount of the legitimate invoices to Park Hill from accounts also controlled by him that had names identified with the clients.  The Company discovered these deceptions shortly after being alerted by Moore Capital Management to the investment scheme.  At no time did Mr. Caspersen have access to or control over the bank accounts, financial system or financial records of Park Hill.

46.    A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ("GAAP").   A company's internal control over financial reporting includes those policies and procedures that:  (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

47.    The Individual Defendants' breaches of fiduciary duty caused or allowed the Company to maintain inadequate compliance and fraud-prevention controls.  These inadequate controls, and in particular the Company payment process that allowed Caspersen to personally invoice clients and its oversight functions, allowed Caspersen to perpetrate his criminal scheme to defraud investors of more than $95 million.

**DAMAGES TO PJT**

48.     As a result of the Individual Defendants' wrongful conduct, defendant Caspersen defrauded investors of $95 million and PJT disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The fraudulent acts and improper statements have devastated PJT's credibility.  PJT has been, and will continue to be, severely damaged by the Individual Defendants' misconduct.

49.     Indeed, the Individual Defendants' misdeeds have subjected PJT to the Securities Class Action and investigations by the SEC and U.S. Attorney's Office.

50.     As a direct and proximate result of the Individual Defendants' actions as alleged herein, PJT's market capitalization has been substantially damaged.

51.     Moreover, these actions have irreparably damaged PJT's corporate image and goodwill.  For at least the foreseeable future, PJT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that PJT's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

52.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

53.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

54.     Plaintiff is an owner of PJT common stock and was an owner of PJT common stock at all times relevant hereto.

55.     Plaintiff will fairly and adequately represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

56.     At the time this action was commenced, the Board consisted of five directors: defendants Taubman, Whitney, Hersch, Ryan, and Rafferty.

57.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

58.     The directors breached their fiduciary duties and face a disabling substantial likelihood of liability for causing PJT to maintain inadequate compliance and fraud-prevention controls, as well as for causing the company to make false and misleading statements.

59.     In addition, defendants Whitney, Hersch, and Rafferty served on the Audit Committee during the relevant time period and approved the improper statements pursuant to their duties and responsibilities as set forth above.  These defendants also failed to ensure the Company possessed necessary internal controls.  The abdication of their fiduciary duties as members of the Board and Audit Committee further subject these defendants to a substantial likelihood of liability rendering demand futile.

60.     Moreover, defendant Taubman lacks independence by virtue of his role as CEO of the Company.  PJT has conceded in SEC filings that defendant Taubman is not an independent director of Company.  In its April 5, 2016 Proxy Statement, PJT concedes that defendant Taubman is not independent.

61.     Further, all of the Director Defendants have served on the Board since the date the Company went public, are too entrenched to fairly consider a demand, and face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the period of the fraudulent scheme, and as such had a fiduciary duty to protect the

Company and its clients from unlawful acts and ensure that the Company complied with all laws and regulations.

62.     Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the actions described herein to occur, damaging the Company and its clients.

63.     If the Company's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged herein by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by PJT against the Individual Defendants, known as the "insured versus insured exclusion."

64.     As a result, if the Director Defendants were to sue themselves or certain of the officers of the Company, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

65.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting the Company by prosecuting this action.  Therefore, demand on the Board is futile and excused.  The Company has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to PJT and face a substantial likelihood of liability for their breaches, rendering any demand upon them futile.

66.     Plaintiff has not made a demand on the other stockholders of PJT to institute this action because such demand would be a futile act for at least the following reasons:  (a) PJT is a publicly held company with almost 18 million shares outstanding and thousands of stockholders; (b) making demand on such a number of stockholders would be impossible for Plaintiff who has no way of determining the names, addresses or phone numbers of the stockholders; and (c) making demand on all stockholders would force Plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## AIDING AND ABETTING AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, each Individual Defendant has pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     The purpose and effect of the Individual Defendants' common course of conduct was, among other things, to disguise their violations of law and breaches of fiduciary duty, and

to enhance executive and directorial positions and receive substantial compensation and/or fees as a result thereof.

69.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to conceal the true fact that PJT was misrepresenting the financial status of its business and financial results.

70.     The Individual Defendants also engaged in a conspiracy, common enterprise, and/or common course of conduct to conceal the vast securities fraud being committed by defendant Caspersen against the Company's customers.

71.     The Individual Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently violate state and federal law, the federal securities laws, and abdicate their duties as directors. Each Individual Defendant was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

72.     Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

73.     At all times relevant hereto, each Individual Defendant was an agent of each of the other Individual Defendants and were at all times acting within the course and scope of such agency.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duty

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as if fully set forth herein.

75.     The Individual Defendants each owe and owed PJT and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs.

76.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of PJT.

77.     The Individual Defendants breached their fiduciary duties owed to PJT and its stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties.  They failed to properly oversee PJT's business, rendering them personally liable to the Company.

78.     Each of the Individual Defendants had actual or constructive knowledge that the Company made the false statements specified above.

79.     As a direct and proximate result of the Defendants' breaches of fiduciary duties of loyalty, good faith, candor, and due care as alleged herein, PJT has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Gross Mismanagement

80.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as if fully set forth herein.

81.     As detailed more fully herein, the Individual Defendants each owed a duty to PJT and its stockholder to prudently supervise, manage, and control PJT's operations.

82.     The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties to prudently manage PJT's business and assets.

83.     As such, the Individual Defendants subjected PJT to the unreasonable risk of substantial losses by failing to exercise due care and by failing to use sound business judgment, including their failure to understand and monitor the Company's fiscal and financial performance.  The Individual Defendants breached their duties of due care and diligence in managing and administering PJT's affairs and by failing to prevent a waste of Company assets.

84.     When discharging their duties, the Individual Defendants knew or recklessly disregarded the wrongful conduct described herein, and either approved management's activities or failed to supervise such activities in accordance with their duties.  The Individual Defendants grossly mismanaged PJT and its assets.

85.     As a direct or proximate result of the Individual Defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, PJT has sustained damage and continues to sustain significant damages and a drastic diminution in value.  As a result of the misconduct alleged herein, all Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### Against the Individual Defendants for Federal Contribution

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as if fully set forth herein.

87.     Defendant Caspersen has been named as a defendant in the Securities Class Action.

88.    The Individual Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

89.    Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the Securities Class Action as his own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and these individual defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

90.    Accordingly, plaintiff asserts this claim derivatively for contribution, as provided by statute.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of PJT and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that the Individual Defendants are obligated to contribute to, indemnify and hold PJT harmless from any fines, penalties, judgment, settlement, or award pursuant to any of the class actions pending or to be filed against PJT or its employees or agents arising out of the braches of duty and wrongdoing alleged herein;

C.    Awarding the amount of damages suffered by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

D.    Awarding PJT restitution from each Individual Defendant;

E.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to, the institution of appropriate corporate governance measures;

25

F.      Awarding plaintiff's reasonable costs and attorneys' fees; and

G.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues.

Dated: May 11, 2016                              **BRAGAR EAGLE & SQUIRE P.C.**


                                                 */s/ J. Brandon Walker*
                                                 J. Brandon Walker
                                                 David J. Stone
                                                 Todd H. Henderson
                                                 885 Third Avenue, Suite 3040
                                                 New York, NY 10022
                                                 Tel: 212-308-5858
                                                 Fax: 212-214-0506

                                                 *Counsel for Plaintiff*